(Slip Opinion) OCTOBER TERM, 2008 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## YSURSA, SECRETARY OF STATE OF IDAHO, ET AL. *v.* POCATELLO EDUCATION ASSOCIATION ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 07–869.   Argued November 3, 2008—Decided February 24, 2009

Idaho's Right to Work Act permits public employees to authorize payroll deductions for general union dues, but prohibits such deductions for union political activities.  Respondents—a group of Idaho public employee unions—sued, alleging that the ban on payroll deductions for political activities violated the First and Fourteenth Amendments.  The District Court upheld the ban at the state level, but struck it down as it applies to local governments.  In affirming, the Ninth Circuit stated that, while Idaho has the ultimate control over local governmental units, it did not actually operate or control their payroll deduction systems.  The court applied strict scrutiny to hold that the statute was unconstitutional as applied at the local level.

*Held:* Idaho's ban on political payroll deductions, as applied to local governmental units, does not infringe the unions' First Amendment rights.  Pp. 5–11.

  (a) Content-based restrictions on speech are "presumptively invalid" and subject to strict scrutiny.  *Davenport* v. *Washington Ed. Assn.*, 551 U. S. 177, ___.  The First Amendment does not, however, impose an obligation on government to subsidize speech.  See *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 549.  Idaho's law does not restrict political speech, but rather declines to promote that speech by allowing public employee checkoffs for political activities.  Idaho's public employee unions are free to engage in such speech as they see fit.  They simply are barred from enlisting the State in support of that endeavor.  Idaho's decision to limit public employee payroll deductions as it has does not infringe the unions' First Amendment rights.  The State accordingly need only demonstrate a rational basis to justify the ban.  Idaho's justification is the

interest in avoiding the reality or appearance of government favorit-
ism or entanglement with partisan politics. See, *e.g.*, *Civil Service
Comm'n* v. *Letter Carriers*, 413 U. S. 548, 565. And the State's re-
sponse to the problem is limited to its source—political payroll deduc-
tions. Cf. *Davenport*, *supra*. The ban plainly serves the State's inter-
est in separating public employment from political activities. Pp. 5–
8.

   (b) The ban at issue is valid at the local level. The same deferential
review applies whether the ban is directed at state or local govern-
mental entities. Political subdivisions have never been considered
sovereign entities but are instead "subordinate governmental in-
strumentalities." *Reynolds* v. *Sims*, 377 U. S. 533, 575. The State's
legislative action is subject to First Amendment scrutiny whether it
is applicable at the state level, the local level, both, or some subpart
of either, but no case suggests that a different analysis applies de-
pending on the level of government affected. The ban furthers
Idaho's interest in separating the operation of government from par-
tisan politics, and that interest extends to all public employers at
whatever level of government. Pp. 9–11.

504 F. 3d 1053, reversed.

   ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA,
KENNEDY, THOMAS, and ALITO, JJ., joined, and in which GINSBURG, J.,
joined as to Parts I and III. GINSBURG, J., filed an opinion concurring in
part and concurring in the judgment. BREYER, J., filed an opinion con-
curring in part and dissenting in part. STEVENS, J., and SOUTER, J.,
filed dissenting opinions.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–869

BEN YSURSA, IDAHO SECRETARY OF STATE, ET AL., PETITIONERS *v.* POCATELLO EDUCATION ASSOCIATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[February 24, 2009]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Under Idaho law, a public employee may elect to have a portion of his wages deducted by his employer and remitted to his union to pay union dues. He may not, however, choose to have an amount deducted and remitted to the union's political action committee, because Idaho law prohibits payroll deductions for political activities. A group of unions representing Idaho public employees challenged this limitation. They conceded that the limitation was valid as applied at the state level, but argued that it violated their First Amendment rights when applied to county, municipal, school district, and other local public employers.

We do not agree. The First Amendment prohibits government from "abridging the freedom of speech"; it does not confer an affirmative right to use government payroll mechanisms for the purpose of obtaining funds for expression. Idaho's law does not restrict political speech, but rather declines to promote that speech by allowing public

employee checkoffs for political activities. Such a decision is reasonable in light of the State's interest in avoiding the appearance that carrying out the public's business is tainted by partisan political activity. That interest extends to government at the local as well as state level, and nothing in the First Amendment prevents a State from determining that its political subdivisions may not provide payroll deductions for political activities.

I

Idaho's Right to Work Act declares that the "right to work shall not be infringed or restricted in any way based on membership in, affiliation with, or financial support of a labor organization or on refusal to join, affiliate with, or financially or otherwise support a labor organization." 1985 Idaho Sess. Laws ch. 2, §1 (codified at Idaho Code §44–2001 (Michie 2003)). As part of that policy, the Act prohibits any requirement for the payment of dues or fees to a labor organization as a condition of employment, §44–2003, but authorizes employers to deduct union fees from an employee's wages with the employee's "signed written authorization," §44–2004(1). The Act covers all employees, "including all employees of the state and its political subdivisions." §44–2011.

Prior to 2003, employees could authorize both a payroll deduction for general union dues and a payroll deduction for union political activities conducted through a political action committee. App. 55–56, 83–84. In 2003, the Idaho Legislature passed the Voluntary Contributions Act (VCA). 2003 Sess. Laws chs. 97 and 340 (codified at Idaho Code §§44–2601 through 44–2605, and §44–2004). That legislation, among other things, amended the Right to Work Act by adding a prohibition on payroll deductions for political purposes. That amendment provides: "Deductions for political activities as defined in chapter 26, title 44, Idaho Code, shall not be deducted from the wages,

earnings or compensation of an employee." §44–2004(2). The term "political activities" is defined as "electoral activities, independent expenditures, or expenditures made to any candidate, political party, political action committee or political issues committee or in support of or against any ballot measure." §44–2602(1)(e). Violations of §44–2004(2) are punishable by a fine not exceeding $1,000 or up to 90 days of imprisonment, or both. §44–2007.

Shortly before the VCA was to take effect, plaintiff labor organizations sued the Bannock County prosecuting attorney, the Idaho secretary of state, and the Idaho attorney general in their official capacities, alleging that the ban on political payroll deductions was unconstitutional under the First and Fourteenth Amendments to the United States Constitution. App. 18–41.[1] The District Court rejected that argument with respect to public employers at the state level, concluding that the First Amendment does not compel the State "to subsidize speech by providing, at its own expense, payroll deductions for the purpose of paying union dues or association fees for State employees." *Pocatello Ed. Assn.* v. *Heideman,* 2005 WL 3241745, \*2 (D Idaho, Nov. 23, 2005). The

_____

[1] The unions also challenged other provisions of the VCA, including one requiring labor organizations to establish a "separate segregated fund" for political activities. Idaho Code §§44–2601 through 44–2605 (Michie 2002); see App. 27–34. In response to that challenge, the State agreed to strike "all of the VCA except for its ban on political payroll deductions." *Pocatello Ed. Assn.* v. *Heideman,* 2005 WL 3241745, \*1 (D Idaho, Nov. 23, 2005). The State asserted that the ban could be "given effect since it operates without reference to the existence of a separate segregated fund." *Ibid.* (internal quotation marks omitted). The unions do not dispute that the ban on political payroll deductions is severable from the other challenged provisions. Plaintiffs' Reply Memorandum in Support of Their Motion for Summary Judgment and in Opposition to the State Defendants' Motion for Summary Judgment, in No. Civ. 03–256–E–BLW (D Idaho, Aug. 15, 2005), p. 3 (hereinafter Plaintiffs' Reply Memorandum).

ban was valid at the state level because "the State is incurring costs to set up and maintain the [payroll deduction] program." *Ibid.* The court struck down the VCA, however, "to the extent that it applies to local governments and private employers," because the State had failed to identify any subsidy it provided to such employers to administer payroll deductions. *Id.*, at \*2 (footnote omitted), \*6.

The state defendants appealed, contending that the ban on political payroll deductions may be constitutionally applied to local government employees. *Pocatello Ed. Assn.* v. *Heideman,* 504 F. 3d 1053, 1057 (CA9 2007). Neither party challenged the District Court's rulings as to private and state-level employees, and therefore the only issue remaining concerned application of the ban to local government employees.

The Court of Appeals agreed with the District Court that there was "no subsidy by the State of Idaho for the payroll deduction systems of local governments." *Id.*, at 1059. The appellate court remarked that "the generalized lawmaking power held by the legislature with respect to a state's political subdivisions does not establish that the state is acting as a proprietor" with respect to local government employers. *Id.*, at 1064. The court instead regarded the relationship between the State and its political subdivisions as analogous to that between the State and a regulated private utility. See *id.*, at 1063–1065 (citing *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.,* 447 U. S. 530 (1980)). While "Idaho has the ultimate power of control over the units of government at issue," it did not "actually operat[e] or contro[l] the payroll deduction systems of local units of government." 504 F. 3d, at 1068. The court therefore applied strict scrutiny to Idaho's decision to prevent local government employers from allowing payroll deductions for political purposes, and held the statute unconstitutional as applied at the

local level. *Ibid.*

We granted certiorari, 552 U. S. __ (2008), and now reverse.

## II

Restrictions on speech based on its content are "presumptively invalid" and subject to strict scrutiny. *Davenport* v. *Washington Ed. Assn.*, 551 U. S. 177, 188 (2007); *R. A. V.* v. *St. Paul*, 505 U. S. 377, 382 (1992). The unions assert that the ban on checkoffs for political activities falls into this category because the law singles out political speech for disfavored treatment.

The First Amendment, however, protects the right to be free from government abridgment of speech. While in some contexts the government must accommodate expression, it is not required to assist others in funding the expression of particular ideas, including political ones. "[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 549 (1983); cf. *Smith* v. *Highway Employees*, 441 U. S. 463, 465 (1979) (*per curiam*) ("First Amendment does not impose any affirmative obligation on the government to listen, to respond or, in this context, to recognize [a labor] association and bargain with it").

The court below concluded, and Idaho does not dispute, that "unions face substantial difficulties in collecting funds for political speech without using payroll deductions." 504 F. 3d, at 1058. But the parties agree that the State is not constitutionally obligated to provide payroll deductions at all. See Plaintiffs' Reply Memorandum 10; see also *Toledo Area AFL–CIO Council* v. *Pizza*, 154 F. 3d 307, 319–320 (CA6 1998); cf. *Charlotte* v. *Firefighters*, 426 U. S. 283, 286 (1976) ("Court would reject . . . contention . . . that respondents' status as union members or their

interest in obtaining a dues checkoff . . . entitle[s] them to special treatment under the Equal Protection Clause"). While publicly administered payroll deductions for political purposes can enhance the unions' exercise of First Amendment rights, Idaho is under no obligation to aid the unions in their political activities. And the State's decision not to do so is not an abridgment of the unions' speech; they are free to engage in such speech as they see fit. They simply are barred from enlisting the State in support of that endeavor. Idaho's decision to limit public employer payroll deductions as it has "is not subject to strict scrutiny" under the First Amendment. *Regan*, 461 U. S., at 549.

Given that the State has not infringed the unions' First Amendment rights, the State need only demonstrate a rational basis to justify the ban on political payroll deductions. *Id.*, at 546–551. The prohibition is not "aim[ed] at the suppression of dangerous ideas," *id.*, at 548 (internal quotation marks omitted), but is instead justified by the State's interest in avoiding the reality or appearance of government favoritism or entanglement with partisan politics. We have previously recognized such a purpose in upholding limitations on public employee political activities. See *Civil Service Comm'n* v. *Letter Carriers*, 413 U. S. 548, 565 (1973) (public perception of partiality can undermine confidence in representative government); *Public Workers* v. *Mitchell*, 330 U. S. 75, 96–100 (1947) (Congress may limit political acts by public officials to promote integrity in the discharge of official duties); cf. *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 809 (1985) (limitations on speech may be justified by interest in "avoiding the appearance of political favoritism"); *Greer* v. *Spock*, 424 U. S. 828, 839 (1976) (upholding policy aimed at keeping official military activities "wholly free of entanglement with partisan political campaigns of any kind"). Banning payroll deductions for

political speech similarly furthers the government's inter-
est in distinguishing between internal governmental
operations and private speech. Idaho's decision to allow
payroll deductions for some purposes but not for political
activities is plainly reasonable.[2]

*Davenport* guides our resolution here. That case also
involved a distinction based on the content of speech:
Specific consent was required from nonunion members
before agency fees charged to them could be used for elec-
tion-related activities, but consent was not required with
respect to agency fees used for other purposes. 551 U. S.,
at 181–182. We rejected the unions' argument that this
requirement violated the First Amendment because it
turned on the content of the speech at issue. *Id.*, at 188–
190. We recognized that the statute, rather than sup-
pressing union speech, simply declined to assist that
speech by granting the unions the right to charge agency
fees for election activities. That decision was reasonable

———————

[2]JUSTICE BREYER finds this analysis inapplicable because the chal-
lenged provision removes politically related deductions from an existing
system. *Post*, at 2 (opinion concurring in part and dissenting in part).
But available deductions do not have tenure; a legislature is free to
address concerns as they arise.

JUSTICE BREYER would also subject the ban to more exacting scrutiny
by analogizing it to various direct restrictions on expression. See *post*,
at 2–4. That analogy misses the mark. A decision not to assist fund-
raising that may, as a practical matter, result in fewer contributions is
simply not the same as directly limiting expression. Cf. *Regan* v.
*Taxation With Representation of Wash.*, 461 U. S. 540, 550 (1983)
("Although [a union] does not have as much money as it wants, and
thus cannot exercise its freedom of speech as much as it would like, the
Constitution does not confer an entitlement to such funds as may be
necessary to realize all the advantages of that freedom" (internal
quotation marks omitted)). We therefore would not subject Idaho's
statute to the "open-ended rough-and-tumble of factors" proposed by
the dissent as an alternative to rational basis review. *Jerome B.
Grubart, Inc.* v. *Great Lakes Dredge & Dock Co.*, 513 U. S. 527, 547
(1995); see *post*, at 4.

given the State's interest in preserving the integrity of the election process. *Ibid.* We also concluded that the State did "not have to enact an across-the-board limitation . . . to vindicate [its] more narrow concern." *Id.*, at 189.

Here the restriction is on the use of a checkoff to fund political activities, but the same analysis governs. Idaho does not suppress political speech but simply declines to promote it through public employer checkoffs for political activities. The concern that political payroll deductions might be seen as involving public employers in politics arises only because Idaho permits public employer payroll deductions in the first place. As in *Davenport*, the State's response to that problem is limited to its source—in this case, political payroll deductions. The ban on such deductions plainly serves the State's interest in separating public employment from political activities.[3]

———————

[3] JUSTICE BREYER suggests that the ban on political payroll deductions may not be applied evenhandedly to all politically related deductions. *Post*, at 4–6 (opinion concurring in part and dissenting in part). JUSTICE STEVENS goes further and would find the ban unconstitutional in all its applications as discriminatory. *Post*, at 1 (dissenting opinion). The District Court, however, noted that the ban "is not viewpoint-based," 2005 WL 3241745, *3; the unions acknowledged in their Court of Appeals brief that they "have not attempted to establish that Section 44–2004(2) is based on viewpoint discrimination," Brief for Plaintiffs-Appellees in No. 06–35004 (CA9), p. 18, n. 13; and nothing in the Questions Presented before this Court raised any issue of viewpoint discrimination.

The ban on political payroll deductions is by its terms not limited to any particular type of political contribution. Nothing in the record suggests that public employers permit deductions for some political activities but not for those of unions. Idaho's attorney general—charged with enforcing the ban—explicitly confirmed that it "applies to all organizations, to any deduction regarding political issues, applies regardless of viewpoint or message, applies to all employers, and it does not single out any candidates or issues." App. 110. If the ban is not enforced evenhandedly, plaintiffs are free to bring an as applied challenge. See *National Endowment for Arts* v. *Finley*, 524 U. S. 569, 587 (1998).

### III

The question remains whether the ban is valid at the local level. The unions abandoned their challenge to the restriction at the state level, but contend that strict scrutiny is still warranted when the ban is applied to local government employers. In that context, the unions argue, the State is no longer declining to facilitate speech through its own payroll system, but is obstructing speech in the local governments' payroll systems. See Brief for Respondents 44–46. We find that distinction unpersuasive, and hold that the same deferential review applies whether the prohibition on payroll deductions for political speech is directed at state or local governmental entities.

"Political subdivisions of States—counties, cities, or whatever—never were and never have been considered as sovereign entities." *Reynolds* v. *Sims*, 377 U. S. 533, 575 (1964). They are instead "subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions." *Ibid.*; see also *Louisiana ex rel. Folsom* v. *Mayor and Administrators of New Orleans*, 109 U. S. 285, 287 (1883) ("Municipal corporations are instrumentalities of the State for the convenient administration of government within their limits"). State political subdivisions are "merely . . . department[s] of the State, and the State may withhold, grant or withdraw powers and privileges as it sees fit." *Trenton* v. *New Jersey*, 262 U. S. 182, 187 (1923). Here the Idaho Legislature has elected to withhold from *all* public employers the power to provide payroll deductions for political activities.

The State's legislative action is of course subject to First Amendment and other constitutional scrutiny whether that action is applicable at the state level, the local level, both, or some subpart of either. But we are aware of no case suggesting that a different analysis applies under the First Amendment depending on the level of government

affected, and the unions have cited none. The ban on political payroll deductions furthers Idaho's interest in separating the operation of government from partisan politics. That interest extends to all public employers at whatever level of government.

In reaching the opposite conclusion, the Court of Appeals invoked our decision in *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530. In that case, we held that a state commission could not, consistent with the First Amendment, prohibit a privately owned electric utility from discussing controversial issues in its bill inserts. *Id.*, at 544. We ruled that the fact that the State regulated the utility did not authorize the prohibition. *Id.*, at 540. The Court of Appeals concluded that the same analysis applied here, and that "the State's broad powers of control over local government entities are solely those of a regulator, analogous to the [state commission's] regulatory power over [the private utility]." 504 F. 3d, at 1065.

That analogy is misguided. A private corporation is subject to the government's legal authority to regulate its conduct. A political subdivision, on the other hand, is a subordinate unit of government created by the State to carry out delegated governmental functions. A private corporation enjoys constitutional protections, see *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 778, n. 14 (1978), but a political subdivision, "created by the state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator." *Williams* v. *Mayor of Baltimore*, 289 U. S. 36, 40 (1933); see *Trenton* v. *New Jersey*, *supra,* at 185 (municipality, as successor to a private water company, does not enjoy against the State the same constitutional rights as the water company: "[T]he relations existing between the State and the water company were not the same as those between the State

and the City").

Both the District Court and the Court of Appeals found it significant that "there is no subsidy by the State of Idaho for the payroll deduction systems of local governments." 504 F. 3d, at 1059; see also 2005 WL 3241745, *2. The Court of Appeals emphasized that there was no evidence that "Idaho has attempted to use its asserted powers to manage the day-to-day operations of local government personnel." 504 F. 3d, at 1067. Given the relationship between the State and its political subdivisions, however, it is immaterial how the State allocates funding or management responsibilities between the different levels of government. The question is whether the State must affirmatively assist political speech by allowing public employers to administer payroll deductions for political activities. For the reasons set forth in this opinion, the answer is no.

\*    \*    \*

The Court of Appeals ruling that Idaho Code §44–2004(2) is unconstitutional with respect to local units of government is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 07–869

_____

BEN YSURSA, IDAHO SECRETARY OF STATE, ET AL.,
PETITIONERS *v.* POCATELLO EDUCATION
ASSOCIATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[February 24, 2009]

JUSTICE GINSBURG, concurring in part and concurring in
the judgment.

The classification question this case presents can be
answered without extended discussion. The parties agree
here, as they did in the Court of Appeals, that Idaho's ban
on payroll deductions for political activities violates First
Amendment limitations as applied to the private sector.
They also agree here, as they did before the Ninth Circuit,
that the ban is permissible as applied to state-level gov-
ernment entities. See *ante*, at 4, 9; Tr. of Oral Arg. 4. The
sole question posed for this Court's decision is the appro-
priate placement of the State's political subdivisions: For
the purpose at hand, should the Court align local-
government employment with private-sector employment
or with state-level employment?

"Given the relationship between the State and its politi-
cal subdivisions," the Court persuasively explains, "it is
immaterial how the State allocates funding or manage-
ment responsibilities between the different levels of gov-
ernment." *Ante*, at 11. I agree that, in the context here
involved, the Constitution compels no distinction between
state and local governmental entities. I therefore join
Parts I and III of the Court's opinion and concur in the
Court's judgment.

# SUPREME COURT OF THE UNITED STATES

No. 07–869

BEN YSURSA, IDAHO SECRETARY OF STATE, ET AL., PETITIONERS *v.* POCATELLO EDUCATION ASSOCIATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[February 24, 2009]

JUSTICE BREYER, concurring in part and dissenting in part.

In Part III of its opinion, the Court points out that the law ordinarily treats municipalities as creatures of the state. See *Reynolds* v. *Sims*, 377 U. S. 533, 575 (1964). Hence the fact that a state statute, rather than a municipal ordinance, limits the use of the municipality's payroll deduction system is beside the point. I agree that this is so, and I agree with JUSTICE SOUTER's discussion about the relationship between the state and the municipality.

I do not agree, however, with the Court's further analysis of the pertinent legal question—whether the state statute violates the First Amendment. Nor do I agree with its ultimate conclusion. Rather, in my view, we should remand this case for further consideration.

The Court's First Amendment analysis emphasizes its characterization of the statute as not "abridging" a union's or a worker's "freedom of speech," but rather "declin[ing] to promote" that speech. *Ante*, at 1 (internal quotation marks omitted). I agree that the First Amendment does not prohibit government from "*declining to promote*" speech. It says that government shall not "*abridg[e]* the freedom of speech." (Emphasis added) . But I do not think the distinction particularly useful in this case.

That is because here the distinction is neither easy to draw nor likely to prove determinative. Sometimes, I concede, the distinction may help. Were there no payroll deduction system at all and were the unions arguing for the creation of such a system from scratch, one might characterize their claim as seeking the *promotion* of speech. But that is not the situation here. A deduction system already exists. The unions attack a separate statutory provision that removes politically related deductions from that system. And linguistically speaking, one need not characterize such an attack as (1) seeking speech *promotion* rather than (2) seeking to prevent an *abridgment* of political-speech-related activity that otherwise (*i.e.*, in the absence of the exception) would occur. In such an instance, the debate over characterization is more metaphysical than practical.

More importantly, the characterization quite possibly does not matter. Suppose, for example, a somewhat similar statutory exception picks and chooses among political causes, prohibiting deductions that help one political party while permitting deductions that help another. The First Amendment result could not turn upon whether one described the exception as an "abridgment" or a "promotion" failure. And, as I shall explain, *infra,* at 5–6, such may be the case here.

I disagree with the Court's characterizations in another respect. The Court says that because the exception "has not infringed the unions' First Amendment rights," "strict scrutiny" does not apply and, thus, the State "need only demonstrate *a rational basis*"—the standard of review applicable to any ordinary legislation that does not infringe fundamental rights—"to justify the ban on political payroll deductions." *Ante*, at 6 (emphasis added). I agree that the exception does not call for "strict scrutiny"—a categorization that almost always proves fatal to the law in question. After all, the exception does not

restrict the content of the unions' speech, impose a prior restraint on that speech, or ban union speech on political issues altogether.

But I disagree with the Court in that I believe there is a First Amendment interest at stake. The exception affects speech, albeit indirectly, by restricting a channel through which speech-supporting finance might flow. As a result, the alternative to "strict scrutiny" is not necessarily a form of "rational basis" review—a test that almost every restriction will pass. And instead of applying either "strict scrutiny" or "rational basis" review to the statutory exception, I would ask the question that this Court has asked in other speech-related contexts, namely whether the statute imposes a burden upon speech that is disproportionate in light of the other interests the government seeks to achieve. See *Burdick* v. *Takushi*, 504 U.S. 428, 433–434 (1992) (election regulation); *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 403 (2000) (BREYER, J., concurring) (collecting cases); see also, *e.g.*, *Thompson* v. *Western States Medical Center*, 535 U.S. 357, 388 (2002) (BREYER, J., dissenting) (discussing the Court's application of this approach in the commercial speech context); *Denver Area Ed. Telecommunications Consortium, Inc.* v. *FCC*, 518 U. S. 727, 740–747 (1996) (plurality opinion) (cable programming regulation); *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, 568 (1968) (government employee speech). Constitutional courts in other nations also have used similar approaches when facing somewhat similar problems. See, *e.g.*, *Libman* v. *Quebec* (Attorney General), [1997] 3 S. C. R. 569 (Canada) (applying proportionality in the campaign finance context); *Bowman* v. *United Kingdom*, 26 European Ct. of Human Rights 1 (1998) (same); *Midi Television (Pty) Ltd* v. *Director of Public Prosecutions* [2007] SCA 56 (RSA) (South Africa) (applying proportionality in the freedom of press context); *Bakri* v. *Israel Film Council,*

HCJ 316/303 (Israel 2003) (applying proportionality in the freedom of expression context).

In these cases the Court has sought to determine whether the harm to speech-related interests is disproportionate in light of the degree of harm, justifications, and potential alternatives. In doing so, it has considered the seriousness of the speech-related harm the provision will likely cause, the importance of the provision's countervailing objectives, the extent to which the statute will tend to achieve those objectives, and whether there are other less restrictive ways of doing so. In light of these considerations, it has determined whether ultimately the statute works speech-related harm that is out of proportion to its justifications. See *Board of Trustees of State Univ. of N. Y.* v. *Fox*, 492 U. S. 469, 480 (1989) (describing need for a "fit" between legislative ends and means "whose scope is 'in proportion to the interest served'"); *United States* v. *American Library Assn., Inc.*, 539 U. S. 194, 217–218 (2003) (BREYER, J., concurring in judgment).

Where context calls for "strict scrutiny," one would not necessarily ask these proportionality questions; but I would ask them in other contexts calling for less than ordinary legislative leeway in light of the fact that constitutionally protected expression is at issue. See *id.,* at 218. To do so, in my view, helps structure what the Court sometimes calls an "intermediate scrutiny" inquiry. See *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622 (1994).

Applying this analysis here, I would find the statutory exception constitutional, but only if I were convinced that the exception applied even handedly among similar politically related contributions. If so, the provision would still negatively affect speech-related interests, for it would close off one channel through which individuals might provide speech-enabling funds to political institutions. But, as the majority points out, many other channels for

those funds exist, and the State has a strong interest in "avoiding the reality or appearance of government favoritism or entanglement with partisan politics," *ante*, at 6. I would consequently find the restriction justified as proportionately serving a legitimate, important governmental need. Cf. *Fox, supra,* at 480.

It is not clear, however, whether the particular exception before us does, in fact, operate even handedly. To read the statute without more, I concede, suggests even handedness. The provision says that "[d]eductions for political activities *as defined in chapter 26, title 44*, Idaho Code, shall not be deducted from wages, earnings or compensation of an employee." Idaho Code Ann. §44–2004(2) (Michie 2003) (emphasis added). And chapter 26, title 44, Idaho Code, defines "political activities" without special reference to labor organizations. See §44–2602(e).

Nonetheless, certain features of the provision suggest it may affect some politically-related deductions, namely labor-related deductions, but not others. Title 44 of the Idaho Code—entitled "Labor"—is about *labor* activities. And the ban on payroll deductions for political activities was enacted as part of a statute in which *every other* provision is concerned solely with union activities. See Voluntary Contributions Act, 2003 Idaho Sess. Laws chs. 97 and 340 (codified at Idaho Code Ann. §§44–2601 through 44–2605 and §44–2004). At the same time, the provision containing the payroll deduction ban is immediately followed by another related provision that expressly mentions labor unions. See §44–2004(3) ("Nothing in this chapter shall prohibit an employee from personally paying contributions for political activities . . . to a *labor organization* unless such payment is prohibited by law" (emphasis added)).

It is important to know whether the exception concerns only labor-related political deductions (while allowing other similar deductions) or treats all alike. A restriction

that applies to the political activities of unions alone would seem unlikely to further the government's justifying objective, namely providing the appearance of political neutrality. And in that case, the provision could well bring about speech-related harm that is disproportionate to the statute's tendency to further the government's "neutrality" objective.

Because the Court of Appeals analyzed the issue as if the State "regulated" its municipalities (as government might regulate a private firm), it did not resolve the questions I have just described. I would remand the case so that it can decide whether the parties appropriately raised those matters and, if so, consider them. Accordingly, I would vacate the Court of Appeals' decision and remand the case.

# SUPREME COURT OF THE UNITED STATES

No. 07–869

BEN YSURSA, IDAHO SECRETARY OF STATE, ET AL., PETITIONERS *v.* POCATELLO EDUCATION ASSOCIATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[February 24, 2009]

JUSTICE STEVENS, dissenting.

In both the public and private sector, payroll managers routinely remit portions of employees' wages to third parties pursuant to the employees' written instructions. For decades, employers in Idaho had discretion to allow such payroll deductions. In 2003, however, the State enacted the Voluntary Contributions Act (VCA), 2003 Sess. Laws chs. 97 and 340 (codified at Idaho Code §44–2004, and §§44–2601 through 44–2605 (Michie 2003)), which, among other things, prohibits employers from allowing any payroll deduction for "political activities," §44–2004(2). For several reasons, I cannot conclude as the Court does that this restriction on payroll deductions was reasonably calculated to further the State's "interest in separating the operation of government from partisan politics," *ante*, at 10. Because it is clear to me that the restriction was intended to make it more difficult for unions to finance political speech, I would hold it unconstitutional in all its applications.

I

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger* v. *Rector and Visitors of Univ. of*

*Va.*, 515 U. S. 819, 828 (1995). On its face, §44–2004(2) restricts payroll deductions for all political activities, and petitioners contend that the State reasonably enacted §44–2004(2) "to avoid either the appearance or the reality of public employer involvement in . . . electoral politics." Tr. of Oral Arg. 15. Several features of the statute, however, belie its purported viewpoint neutrality.

That the restriction was more narrowly intended to target union fundraising is first evidenced by its statutory context. The other provisions of the VCA with which §44–2004(2) was enacted pertain exclusively to unions.[1] For instance, §44–2603 requires unions to create separate funds for political activities and places restrictions on unions' solicitation of political contributions; §44–2604 makes it a misdemeanor, among other things, for unions to make expenditures for political activities from union dues; and §44–2605 establishes registration and reporting requirements for union political funds. The provisions proximate to §44–2004(2), which were enacted roughly two decades earlier as part of the Right to Work Act, 1985 Sess. Laws ch. 2, §1 (codified at Idaho Code §44–2001 *et seq.*), are similarly directed at union activities. Even the subsection immediately preceding §44–2004(2) is aimed specifically at unions: §44–2004(1) prohibits payroll deductions for union dues, fees, assessments, or other charges without an employee's prior written authorization. And, finally, §44–2004(2) is codified in a title of the Idaho Code entitled "Labor" and in a chapter entitled "Right to Work." Together, these statutory features strongly suggest that the Idaho Legislature enacted §44–2004(2) specifically to impede union fundraising.

---

[1] Respondents also challenged these provisions of the VCA, and petitioners conceded their invalidity earlier in this litigation, acknowledging that they violated the First Amendment by restricting the ability of labor organizations to solicit political contributions. See *Pocatello Ed. Assn.* v. *Heidman*, 504 F. 3d 1053, 1057 (CA9 2007).

The statute's discriminatory purpose is further evidenced by its substantial overinclusiveness and underinclusiveness with respect to the State's asserted interest in passing the legislation. Petitioners contend that the restriction was enacted to further the State's interest in avoiding the appearance or actuality of public employer involvement in partisan politics. See Tr. of Oral Arg. 15. But, as enacted, §44–2004(2) prohibited private as well as public employers from making payroll deductions for political activities. As petitioners admitted at oral argument, "the State has no interest in . . . private employers' determination to be involved or not involved in political matters." *Id.*, at 6. That petitioners conceded the invalidity of §44–2004(2) as applied to private employers earlier in this litigation does not require us to ignore the breadth of the statute the State enacted in assessing the provision's scope and purpose. Consideration of the provision actually passed by the legislature makes clear that the State's asserted interest in the restriction is not compatible with its breadth.

The State's interest in avoiding the appearance or reality of employer political involvement is also inconsistent with its decision not to restrict deductions for charitable activities. Such deductions will often present a similar risk of creating an appearance of political involvement as deductions for covered political activities. Yet the State has made no effort to distinguish this type of political activity. As with the State's decision to apply §44–2004(2) to private employers, its failure to apply the restriction to charitable deductions produces a significant mismatch between the restriction's reach and its asserted purpose.

To my mind, it is clear from these features of the legislation that §44–2004(2)'s prohibition on payroll deductions for "political activities" was intended to target union political activity. Cf. *Chamber of Commerce of United States* v. *Brown*, 554 U. S. \_\_\_, \_\_\_, \_\_\_ (2008) (slip op., at 10, 12)

(noting that a rule restricting the use of state funds to promote or oppose unionization impermissibly expressed a pro-union preference, thereby chilling one side of the public debate).[2]  The majority's facile assertion that the First Amendment does not confer a right to government subsidization of private speech cannot validate an evidently discriminatory restriction on fundraising for political speech.[3]

## II

Although the statute's discriminatory purpose provides an adequate ground for deciding this case, I briefly note my disagreement with the majority's analysis of §44–2004(2)'s constitutionality as applied to local government employees.  The Court of Appeals found this application of the provision invalid due to the State's failure to show that it "actually operates or controls the payroll deduction systems of local units of government." *Pocatello Ed. Assn.*

---

[2] It may even be true that §44–2004(2) only affects union political activity, as petitioners can point to no evidence that another entity is affected by the statute.  See Tr. of Oral Arg. 8.  But it is unnecessary to determine whether other entities are actually affected by the restriction in light of its clearly discriminatory purpose.

[3] The discriminatory nature of §44–2004(2) distinguishes it from the restriction we upheld in *Davenport* v. *Washington Ed. Assn.*, 551 U. S. 177 (2007)—a decision on which the majority heavily relies.  In that case, state law authorized public-sector unions to charge nonmembers an agency fee equivalent to membership dues and to have employers collect that fee through payroll deductions.  Respondent challenged the validity of a state ballot initiative requiring public-sector unions to obtain nonmembers' affirmative authorization before using their fees for political purposes.  We held that the affirmative-authorization provision did not violate respondent's First Amendment rights because it merely placed a viewpoint-neutral limitation on an "extraordinary" state-law entitlement allowing it to collect and spend the money of government employees. *Id.*, at ___, ___ (slip op., at 9, 10).  By contrast, §44–2004(2) is not a limitation on a state-law entitlement that specifically benefits unions but rather a union-specific exclusion from a generally available benefit.

v. *Heidman*, 504 F. 3d 1053, 1068 (CA9 2007).[4]   In the absence of evidence of such control, the Court of Appeals held, "the State has a relatively weak interest in preventing [respondents] from exercising their First Amendment rights." *Ibid.*

Unlike the Court of Appeals, the majority omits any examination of the relationship Idaho has established with its political subdivisions.  Rather, the majority finds it sufficient to assert that States, as the creators of local government, retain the authority to grant or withdraw subdivision powers and privileges.  *Ante*, at 8.  The fact of that authority, however, hardly proves that the particular relationship between a State and its political subdivisions is irrelevant to our constitutional inquiry.  All States do not treat their subdivisions the same, and those differences are sometimes consequential.

We have in other contexts recognized the constitutional significance of the relationship a State chooses to establish with its political subdivisions.  For instance, in *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274, 280 (1977), we stated that the answer to the question whether a school board should "be treated as an arm of the State partaking of the State's Eleventh Amendment immunity . . . depends, at least in part, upon the nature of the entity created by state law."   And in *McMillian* v. *Monroe County*, 520 U. S. 781, 786 (1997), we held that whether a sheriff has county or state policymaking authority for purposes of determining liability under Rev. Stat. §1979, 42 U. S. C. §1983 is ascertained by reference to "the actual function of a government official," which is in turn "dependent on the definition of the official's functions under relevant state law."   In both cases, the constitutional

---

[4] The State conceded at oral argument before the Court of Appeals that it is not the proprietor of local government workplaces or their payroll deduction programs.  See 504 F. 3d, at 1065.

analysis turned in part on the way the State had struc-
tured its relationship with its political subdivisions.

Although we have not previously considered the impli-
cations of the state-subdivision relationship in the First
Amendment context, we have repeatedly recognized the
significance of an analogous inquiry: whether the govern-
ment, in imposing speech restrictions, is acting in its
capacity as regulator or proprietor. See, *e.g.*, *Davenport* v.
*Washington Ed. Assn.*, 551 U. S. 177, at ___ (2007) (slip
op., at 9–10); *Cornelius* v. *NAACP Legal Defense & Ed.
Fund, Inc.*, 473 U. S. 788, 805–806 (1985). Accordingly, I
cannot agree with the majority's assertion that, because
political subdivisions are instrumentalities of the State, "it
is immaterial how the State allocates funding or manage-
ment responsibilities between the different levels of gov-
ernment," *ante*, at 11. Relationships between state and
local governments are more varied, and the consequences
of that variation are more significant, than the majority's
analysis admits.

Because my conclusion that §44–2004(2) discriminates
against labor organizations is sufficient to decide this case,
I find it unnecessary to fully consider the implications of
Idaho's relationship with its political subdivisions.
Rather, I note the significance of this relationship to urge
its careful consideration in future cases.

### III

The majority avoids acknowledging §44–2004(2)'s evi-
dently discriminatory purpose only by examining the
statute out of context and ignoring its initial applicability
to private employers. Considering the provision as en-
acted, I cannot find it justified as the majority does by "the
State's interest in avoiding the reality or appearance of
government favoritism or entanglement with partisan
politics," *ante*, at 6. The impermissible purpose that quite
obviously motivated the enactment of the VCA and fully

justified its invalidation as applied to private employers should have produced a judgment in this case holding the entire statute invalid, rather than a judgment producing a new statute that the Idaho Legislature did not enact.

I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

No. 07–869

BEN YSURSA, IDAHO SECRETARY OF STATE, ET AL., PETITIONERS *v.* POCATELLO EDUCATION ASSOCIATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[February 24, 2009]

JUSTICE SOUTER, dissenting.

If I thought this case should be classified solely as one about the First Amendment's limits on a State's management of its own affairs, I would join the judgment, and as it is I agree with much of the Court's opinion. So far as Idaho's law affects freedom of expression, I am not persuaded there is sufficient reason to treat the State's statutory prohibition differently depending on the unit of its government employing the worker whose salary deduction would fund political activity. There is no question in this case that the lower echelons of Idaho government are creatures of the State exercising state power in discharging what are ultimately state responsibilities. Nor is there any apparent reason to think the State's asserted legitimate interest differs according to the level of government doing the State's work, whether that interest is having a firewall between public administration and politics or simply exercising a power to decide whether public employees who administer payrolls should spend work time advancing private political speech.

But I find it impossible to stop there. Although this case comes to us as one about the scope of the public business the State is free, within reasonable limits, to manage as it thinks wise, the specter of another First Amendment

category, one of superior significance, is too insistent to ignore. It is true that government may choose to manage its own affairs in ways that draw reasonable subject-matter lines affecting speech, being free, for example, to sell space on its buses for advertising soap but not politicians. See *Lehman* v. *Shaker Heights*, 418 U. S. 298 (1974). But a government is not free to draw those lines as a way to discourage or suppress the expression of viewpoints it disagrees with, *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 806, 811–812, (1985); *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 46, 49 (1983); only narrow tailoring to serve a compelling state interest could justify that kind of selectivity, see *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 813 (2000).

This difference between viewpoint discrimination and neutral regulation of governmental activity is on point in this case. For although the State invokes its legitimate interest in keeping public administration free from political involvement as its reason for Idaho Code §44–2004(2) (Michie 2003), this ostensibly viewpoint-neutral rationale suffers from the circumstances JUSTICE STEVENS describes in detail, see *ante*, at 2–4 (dissenting opinion). Every other provision of the amendatory act in which §44–2004(2) was included deals with unions, the statute amended regulates unions, and all this legislation is placed in the State's labor law codification. *Ante.*, at 2. Union speech, and nothing else, seems to have been on the legislative mind.

The Court's answer to this recalls *Davenport* v. *Washington Ed. Assn.*, 551 U. S. 177 (2007), in suggesting that Idaho was merely limiting a self-created risk of entangling public administration with politics, which followed from authorizing public payroll deductions for union benefit in the first place, *ante*, at 7–8. But the scope of the state enactment that imposes the prohibition places that expla-

nation in question, for the statute goes beyond constraining the government as employer, and criminalizes deductions for political purposes even when administered by private employers, an application of the law the State concedes is unconstitutional. *Pocatello Ed. Assn.* v. *Heideman*, 504 F. 3d 1053, 1057 (CA9 2007). Hence a reader of the statute may fairly suspect that Idaho's legislative object was not efficient, clean government, but that unions' political viewpoints were its target, selected out of all the politics the State might filter from its public workplaces.

What to do about this reasonable suspicion of viewpoint discrimination is a dilemma. We can hardly disregard it, for it affects the weight this case can carry as precedent; a decision that ignores the elephant in the room is a decision with diminished authority. But the potential issue of viewpoint discrimination that should be addressed in this case is not before us. Although the unions' brief alludes to viewpoint discrimination in several places, that is not the focus of their argument. The unions, instead, aim at showing that the State is acting as a regulator of local governments (much as it regulates private corporations), not as a manager setting limits to what government will do with public resources; consequently they rest their position on the argument that any state discrimination against political speech is illegitimate, however consistently all shades of political speech may be treated. And even if we could properly recast the case by remanding to consider viewpoint discrimination, see *Cornelius, supra*, at 811–812, a remand could only affect the application of the statute to subordinate units of government; the unions have accepted the constitutionality of applying the law to the State, where an effort at viewpoint discrimination would be as unconstitutional as it would be at the level of a town.

The upshot is that if we decide the case as it comes to us

we will shut our eyes to a substantial, if not the substantial, issue raised by the facts. But if we were to expand the issues presented to us by remanding for enquiry into viewpoint discrimination, we would risk having to wink later at an unconstitutional application of the law to the State, owing to the unions' decision not to challenge that application either in the Ninth Circuit or before us. This is a good description of a case that should not be in this Court as a vehicle to refine First Amendment doctrine.

I would dismiss the writ of certiorari as improvidently granted, and I respectfully dissent.